No. 11,009.

CITIZENS BANK OF LOUISIANA VS. DAVID F. MILLER ET AL.

INTERVENTIONS OF EXCELSIOR PLANTING AND MANUFACTURING COMPANY, AND I. K. OBER ET AL.

CITIZENS BANK OF LOUISIANA VS. G. OBER & SONS CO. ET AL.

CONSOLIDATED.

| 44 | 199 |
|----|-----|
| 45 | 294 |
| 45 | 475 |
| 45 | 494 |
| 45 | 856 |
| 44 | 199 |
| 47 | 1469 |
| 44 | 199 |
| 48 | 1264 |
| 44 | 199 |
| 106 | 217 |
| 44 | 199 |
| 116 | 882 |
| 44 | 199 |
| 118 | 467 |

1.  The pact *de non alienando* inserted in a mortgage is nothing more than the expression in the act of a principle which, by the terms of Article 3397 of the Civil Code is, without any expression, conclusively implied in every mortgage.

2. The effect given to the pact under our jurisprudence rests on no general principle of our existing law, but simply on a judicial interpretation of its effect as a contract between the parties. The pact historically considered. Donaldson vs. Maurin, 1 La. 39.

3. That effect is clearly defined and limited to be nothing more than the conferring of authority to seize the property in the hands of third possessors by proceedings directly against the original mortgagor without notice to third possessors or other preliminary proceedings required in the ordinary hypothecation.

4. The pact *de non alienando* does not prevent the alienation of the property, nor does it deprive the alienees of any rights appertaining to third possessors, except so far as concerns the method of proceeding above indicated.

5. Hence a purchaser of property subject to a mortgage containing the pact is a third possessor within the purview of Article 3407, and entitled to claim compensation for his improvements to the extent that they have enhanced the value of the mortgaged security.

6. The improvements fall under the mortgage and are subject to seizure and sale, but equity requires that the third possessor should be indemnified to the extent that he has enhanced the value of the creditor's security.

7. In determining the amount recoverable, the sole question is the extent to which they have enhanced the value. Repairs which only preserve the thing are not recoverable; only those improvements which increase the value.

8. Assumptions contained in contracts to which the bank was not party have no effect in its favor, except as stipulations *pour autrui* of which the bank might have availed itself by accepting them, but which, until acceptance, were revocable, and conferred no right on the bank.

9. Acceptance by the bank would have made it a party to the contracts, which it would have been bound to respect. Its whole course in this case has been an absolute repudiation of these contracts as in no manner affecting it, and it is estopped from claiming *uno flatu* an acceptance.

10. Where a seizure takes place during the pendency of a plantation lease for the entire year, payable in kind out of the crops when gathered, the seizure only covers the proportion of rents due for the unexpired term after its date. The seizing creditor is also responsible for its like proportion of the necessary expenses of management required to realize the crops and which it left undisturbed after seizure.

APPEAL from the Ninth District Court, Parish of Concordia. *Young, J.*

*Henry C. Miller* for Plaintiff and Appellant:

The mortgage creditor, with the act of mortgage containing the stipulation *de non alienando*, can not be affected by the expenditures which a third person, with full knowledge of the mortgage, chooses to make upon the mortgaged property. If such expenditures are to be paid to the prejudice of the mortgage debt, the security arising from the mortgage would in most cases completely disappear. C. C., Art. 3397; Nathan vs. Lee, 2d N. S. 32; Guesnard vs. Soule, 8 An., p. 58; 1st Hennen's Digest, p. 955, No. 1, *et seq.*

Bank vs. Miller et al.

One who purchases property mortgaged with the pact *de non alienando* is, with respect to the mortgage creditor, in no position better than the debtor. Hence such purchaser, least of all when bound for the debt, can not, as against the mortgage creditor, claim to be paid money expended on the property. Such a purchaser is not a third possessor in legal contemplation. Ibid.; Civil Code, Article 3399, *et seq.*; C. P., Article 61, *et seq.*: Hennen's Digest, p. 955, Nos. 1, 10, 12; 8th Rob. 165; 9th Rob., p. 69.

The rents of the property seized becoming due after the seizure, whether in money or in part of the crops, accrue to the seizing creditor. See C. P., Art. 656; C. C., Art. 466; Summers vs. Clark, 30 An., p. 436; Townsend vs. Payne, 42 An. 914.

---

*Luce & Lemle* on the same side.

---

*Elam & Daff*, contra, cited: C. C., Art. 3407; 6 N. S. 114; 2 An. 365; 31 An. 218; 1 La. 39; 8 Rob. 167; 5 Rob. 50; 19 La. 413.

---

The opinion of the court was delivered by

FENNER, J.  The Citizens Bank is the holder of a mortgage on the Point Pleasant plantation, executed in its favor by David F. Miller in 1838, and containing the pact *de non alienando*.

In the long period since the date of mortgage the property has experienced several changes of ownership.

In the year 1882 its then owners transferred the property to the Excelsior Planting and Manufacturing Company, which was the owner and possessor in 1891, when the Citizens Bank, proceeding *via executiva* directly against the heirs of the original mortgagor, David F. Miller, obtained an order of seizure and sale in foreclosure of their mortgage. In this proceeding intervened the Excelsior Planting Company, claiming that during its ownership and possession of the property it had placed thereon valuable improvements, which had enhanced its value, and that to the extent of the enhanced value it was entitled to be reimbursed out of the proceeds of sale.

I. K. Ober et. al., mortgage creditors of the Excelsior Company, also intervened, claiming a ranking mortgage on whatever might be found due to their debtor for improvements. The Citizens Bank opposes the claims of the intervenors on various grounds, which will now be considered and disposed of *seriatim*, forming the issues in-

volved in the first of these consolidated cases, which, though disposed of by one judgment, are entirely independent of each other.

1. The bank claims that a purchaser of property subject to a mortgage containing the pact *de non alienando* stands in the shoes of the original mortgage debtor, and can not, any more than that debtor himself, claim reimbursement on account of improvements made on the property; in other words, that he is not, in the eyes of the law, a third possessor, and is not, therefore, entitled to the protection of Art. 3407, C. C., which is the basis of intervenors' claim, and which reads as follows:

" The deteriorations which proceed from the deed or neglect of the third possessor to the prejudice of the creditors who have a privilege or a mortgage give rise against the former to an action of indemnification, *but he can claim for his expenses or improvements only to the amount of the increased value which is the result of the improvements made.*"

The question raised is an interesting one, and we have considered it very closely. To the student of our codes the effect given to the pact *de non alienando* is an anomaly, only explained by reference to its derivation in our law from the Spanish system.

The pact is nothing else than the expression in the act of mortgage of a principle, which, by the very terms of Art. 3397 of the Code, is, without any expression, implied in every mortgage, viz.: "That the debtor can not sell, engage or mortgage the same property to other persons to the prejudice of the mortgage which is already made to another creditor."

It is difficult to understand why the fact that this principle is expressed in the act should confer any different rights than would result from its conclusive implication.

There is no express provision in either our Civil Code or Code of Practice on the subject; and in the French law, from which our system of mortgages is derived, this pact *de non alienando* is not recognized as conferring any peculiar right.

Under the Spanish law, however, which long prevailed in this State, the holder of a mortgage containing this pact was allowed to disregard subsequent alienations and to proceed directly against the original mortgagor and have the property seized and sold without notice to actual third possessors, which was required in other cases.

After the adoption of our code of 1808 the question arose as to whether this effect of the pact was not destroyed; but the court held that "the mode of proceeding, under orders of seizure and sale, is still regulated in a great measure by the Spanish laws which remain in force in this country," and that the mortgagee's right under the pact *de non alienando* was not repealed. Nathan vs. Lee, 2 Mart. N. S., p. 32.

After the Act of 1828, which repealed the Spanish laws and rules of proceeding, the question again arose, and it was contended "that there is now no express law in force to support any exception to the rules of proceeding established by the Code of Practice for hypothecary actions." But the court said: "Admitting this to be true, it is an universal principle, founded in reason and law, that effect must be given to all the parts of a written contract or agreement, and meaning to all its stipulations and phrases, unless such a construction leads to absurdity. It is also a general rule that owners of property must be presumed to know the titles and encumbrances under which they hold it. In applying these rules to the case under consideration, it is evident that the mortgagee intended some advantage to himself by the introduction of the clause *de non alienando*, consented to on the part of the mortgagor, beyond what he would have had without such a pact or agreement, and that the only manner in which it can have the effect intended by the parties is to construe it into an authority to seize the property in the hands of the third possessors, without preliminary proceedings, as in case of an ordinary hypothecation." Donaldson vs. Maurin, 1 La. 39.

This decision is the fountain head of our whole subsequent jurisprudence on this subject. We consider that it conclusively negatives the contention so ably urged by counsel for appellants. It distinctly holds that after the repeal of the Spanish law formerly prevailing in this State, there remained in force no law giving any exceptional effect to the pact *de non alienando*, and that whatever effect it had was derived from that law which the parties made unto themselves by their contract; it interpreted the meaning and effect of that contract and declared that its only effect was to authorize a direct seizure in the hands of third possessors, "without preliminary proceedings, as in case of an ordinary hypothecation." There are not wanting very clear reiterations of this principle in later cases.

On this point the court, in the case of Bondurant vs. Watson, 30 An. 10, said:

"We understand the effect of the pact *de non alienando* to be this: where a mortgage contains this stipulation, the sale by the mortgagor does not prevent the mortgagee from proceeding by the executory process, and he need not give any notice to the purchaser.

"A little reflection will show that the pact *de non alienando* contains nothing that the law does not imply in every mortgage,  *  *  We understand the effect of the pact to be this: where a mortgage contains this stipulation, the sale by the mortgagor does not prevent the mortgagee from proceeding by executory process and he need give no notice to the purchaser."

Again, in Ducros vs. Fortin, 8 Rob. 167, the court said:

"We do not consider the clause *de non alienando* as producing the effects supposed by the counsel. It does not absolutely prevent a sale of the property by the mortgagor. The latter may transfer the property subject to the right which such a clause gives the mortgagee of proceeding summarily against it, as if it still belonged to the mortgagor. The purchaser acquires a valid title, which he can, in like manner, transfer to others."

In Linn vs. Dee, 31 An. 218, the right of the purchaser of property subject to a mortgage containing the pact, to recover for improvements, was expressly recognized.

See also Ducros vs. Fortin, 8 Rob. 167; Jamison vs. Barelli, 20 An. 453.

The correctness of this is conspicuously illustrated by the particular form given to the pact in the very mortgage on which the bank proceeds, and which is derived from Sec. 24 of the charter as follows:

That "all property mortgaged to said corporation for any purposes may be seized and sold at any time, according to law, in whosoever hands or possession the same may be, notwithstanding any alienation thereof or change of possession by succession or descent to heirs or legatees, by last will and testament, or otherwise, in the same manner as if the same was in the possession of the original mortgagor."

This is the only pact of non-alienation contained in the charter or mortgage; and it has been held by this court to be the exact equiva-

lent of the common pact *de non alienando*. Citizens Bank vs. Gillespie, 30 An. 1321; Id. vs. Freitag, 37 An. 271.

Now this section simply expresses, in plain language, the precise sense and meaning which the jurisprudence above referred to had held to be implied in the pact *de non alienando*, conferring no exceptional right beyond that therein stated of proceeding directly against the property without notice to third possessors. The learned lawyers who framed this charter in 1835 were obviously doubtful whether, under the changed law, the interpretation given to the ordinary pact would be maintained, and preferred to give a clearer expression to their contracts. They have done so, and can claim nothing beyond what their contract gives them. This they have been allowed, and have actually proceeded, in this case, by executory process against the original mortgagee, without notice to third possessors, in the very manner stipulated by their contract.

The apprehension, suggested by counsel, that mortgage creditors may be deprived of their security by ruinous improvements on the part of third possessors, has no greater application to the case of mortgages in which the non-alienation pact is expressed than in that of all others in which the law itself writes it; and, besides, it has no foundation under a first application of the principle.

The improvements, by whomsoever made, fall under the mortgage. If they have not actually enhanced the value of the property the mortgagee absorbs them without compensation. If they have enhanced the value of the property, why should the mortgagee enrich himself at the expense of the third possessor?

In the language of Troplong: " There is no room for doubt that improvements placed by a third possessor fall under the mortgage and are subject to seizure for its satisfaction, but equity requires that the third possessor should be indemnified to the extent that they have enhanced the value of the property, *quatenus res pretiosior facta est;* for the creditors who dispossess him should not be permitted to enrich themselves at his expense." 3 Troplong, Hyp. et Priv., No. 836.

Or as Pont says: " From a sense of equity, the legislator, who forbids the third possessor to injure the creditor by deteriorating the security while in his possession, will not, on the other hand, permit the creditors to profit gratuitously by his improvements. Therefore, the law, after announcing the principle of indemnity for de-

teriorations, by a just reciprocity, assures to the third possessor the reclamation of the enhanced value given by his improvements." 2 Pont, Priv. et Hyp., No. 1205.

This is justice, and it is, undoubtedly, the law, applicable equally to all mortgages, whether the pact *de non alienando* be expressed or only implied in the contract.

2. The bank further contends that the planting company and its authors, by reason of their assumptions contained in their contracts with each other, have become personally bound to the bank for the debt secured by its mortgage, and that this prevents them from asserting any claim for improvements. These assumptions are contained in contracts between these parties to which the bank was in no manner a party. They can have no effect in favor of the bank, except as stipulations *pour autrui*, of which, perhaps, the bank might have availed itself by accepting them, but which, up to the time of such acceptance, were revocable between the parties, and conferred no right whatever on the bank. Rev. C. C. 1890; Gravier vs. Gravier, 3 N. S. 207; Wiggin vs. Flower, 5 Rob. 406; Mitchell vs. Cooley, 5 Rob. 240.

The bank has never accepted. If it had done so it would thereby have made itself a party to those contracts, which it would thereafter have been bound to recognize and respect. Mitchell vs. Cooley, 5 Rob. 240.

While such acceptance would not have operated a novation of the debt, it would unquestionably have disabled the bank from disregarding these alienations to which it had thus made itself a party. The proceeding in this case and all the contentions of counsel which we have been considering are based upon the assumption that the bank is in no manner affected by those alienations, that, as to it, they produced no effect, and that it was entitled to treat them as if they did not exist. It is impossible to say this, and then, *uno flatu*, to say I have accepted these stipulations, have made myself a party to these contracts, and hold you bound by them.

The case of Latiolais vs. Citizens Bank, 33 An. 1444, only held that by the acceptance of such an assumption the bank did not waive the pact *de non alienando* so far as the original mortgagee was concerned, who was the only party urging it. We said:

"The pact *de non alienando* was not abandoned. On the contrary, it was carried out by the proceedings against Sproule and

others. Admitting that it was, however, what is it to the plaintiff, who is the administratrix of the succession of the original mortgagor, whether it ever existed at all?" No one could question the correctness of this decision, but it has no application to the point here at issue, which concerns only the rights of third possessors.

It is too late for the bank now to urge an acceptance of these stipulations, and it is conclusively estopped from doing so.

3. The final question under this branch of the case is as to the settlement of the amount due for improvements.

The principle applicable is very clearly stated by Toulier: " The third possessor can recover only for improvements *quæ rem meliorem faciunt*, and not for those *quæ rem deteriorem non sinunt*. The only question is to ascertain if there has been an enhancement of value.

" Whether such enhancement result from expenses necessary in their origin but carried to the point of improvement, or whether they result from less urgent expenses, matters nothing, If there has been an enhancement, the right arises to claim it to the extent of the increased value. If there has been no enhancement, the third possessor has no recourse except against his vendor." 3 Trop., Priv. et Hyp., No. 838 (bis), p. 505.

We have examined the evidence in the case very critically. No doubt some of the improvements claimed belong to the class of ordinary repairs, merely intended to preserve the *status quo*, which the possessor was bound to make and for neglect to make which he would have been responsible under Article 3407 as " deteriorations proceeding from his neglect." Of course, these could not operate to enhance, but only to maintain, the value. But the new church, the new cabins, the new fences, the new levee, and perhaps, to some extent, the extensive repairs to the dwelling house, are certainly entitled to consideration.

The following decisions relied on by counsel for appellant do not apply to this case: D'Aquin vs. Coison, 3 La. 398; Haynes vs. Harbor, 14 An. 236; McKenzie vs. Bacon, 41 An. 13.

They relate to controversies between evicted possessors and their warrantors or vendors, or between such mere possessors in good faith and the true owner, which rest on different principles. In those cases the benefits derived by the possessor from his improvements, as well as their cost, are to be considered.

Here we have nothing to do with either benefits or cost, except with the latter as limiting the possible claim of the third possessor. We have simply to inquire whether the improvements have enhanced the value, or are of a nature which only prevented deterioration. The improvements are not to be considered separately, but *in block*, and it is to be determined whether, as a whole, they have enhanced the value of the security, and to what extent. The estimates of various witnesses on this precise question are found in the record. They differ widely. We think the judge *a quo* made, in his judgment, a very conservative and satisfactory estimate, and while both parties complain, we should not feel that, by disturbing, we could improve it.

## II.

The suit of the Bank vs: Ober & Sons Co. et al. is to recover rents alleged to have been collected by the latter after the date of the bank's seizure in the case just decided.

It appears that early in 1891 Ober and others, vendors of the Excelsior company, had issued a seizure and sale in foreclosure of their mortgage under which the property was taken in possession by the sheriff. In that suit it was agreed between plaintiff and defendant that the sheriff should cultivate the property provided the plaintiffs would furnish the means, the expenses up to the date of sale to be taxed as costs, and D. M. Slocum was appointed as custodian and manager.

Slocum made contracts with tenants by which the land was leased for the year for rents payable in kind out of the crops.

Defendants (in this case) furnished the tenants with mules and teams to work the land and also advanced them supplies.

In May, 1891, the bank issued its executory process and seized the property.

After this seizure the cultivation and management of the plantation went on as before. Slocum remained in charge and devoted his time as manager, without interference by the bank.

As the crop was gathered and ginned he collected the rents. After he had collected rents to the extent of 8271 pounds of lint cotton, the bank, under an order from the sheriff, demanded delivery thereof and it was handed over to the bank.

He refused to give the bank any more of the rent cotton, the balance of which was shipped for account of defendants.

The total rent cotton collected was 22,000 pounds, worth in all about $1800, of which, as above stated, the bank received 8271 pounds, worth about $700.

It is claimed that defendants must pay over, without deduction, the whole of the rent collected.

We consider the claim inequitable and untenable in law.

The rent, though it became due after the bank's seizure, was contracted for and attributable to the year, and the defendants were entitled to the proportion thereof due on account of the part of the year which had expired prior to the bank's seizure, which took place on May 1, being four months, or one-third of the total rents. The bank should also be held for two-thirds of the expenses of Mr. Slocum's management and services, which are shown to have been worth about $800 and which were necessary to the realization of the rents.

A brief calculation on this basis will show that there remains due to the bank out of the rents just about the sum decreed in the judgment of the court below, which we see no reason to alter.

Judgment affirmed.